IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No. 1:14-cr-0221** |
| **v.** | : | |
| **JOSEPH RAMON GALLARDO** | : | **Judge Sylvia H. Rambo** |

## M E M O R A N D U M

Before the court are Defendant Joseph Gallardo's ("Defendant") objections to the Pre-Sentence Report, which are opposed by the Government. For the reasons that follow, the court will deny Defendant's objections.

## I.   Background

Between 2006 and 2009, Defendant was a registered investment adviser representative with two independent brokerage houses, Investors Capital Corporation and brokersXpress. (Doc. 17, ¶ 4.) In that capacity, Defendant perpetuated a fraudulent scheme wherein he solicited and obtained millions of dollars in client funds to invest into his personal real estate venture, Blue Meadow Group LLC, Real Estate Investment Trust ("Blue Meadow Group"), which, unbeknownst to his clients, was not a registered real estate investment trust. (*Id.* at ¶¶ 4-5, 8.) Defendant induced his clients to invest in this so-called trust by promising them varying guaranteed rates of return, falsely representing that their money was invested in and protected by real estate, and falsely representing the number, dollar value, and profitability of the real estate holdings. (*Id.* at ¶ 6.)

Defendant further misled his clients by making various payments to them that he falsely characterized as returns on profitable real estate investment activity. (*Id.*) In addition to using investor funds to pay purported interest to other investors, Defendant also used those funds to finance his own risky and unprofitable day trading activity, to pay personal living expenses, and to purchase a Lukoil gas station and convenience store franchise, which experienced steady substantial losses. (*Id.* at ¶¶ 8, 9,15.) The application submitted by Defendant to obtain the franchise included false personal financial statements and failed to report Defendant's use of funds received from investors. (*Id.*)

In April 2009, the Pennsylvania Securities Commission formally advised Defendant that it was investigating Blue Meadow Group, in response to which Defendant falsely stated that he had no interest or ownership in the group and that he never advised his clients to invest therein. (*Id.* at ¶ 10.) Defendant then induced clients to corroborate his false assertions to the Pennsylvania Securities Commission in writing. (*Id.*) In July 2009, the Pennsylvania Securities Commission issued a Summary Order to Cease and Desist against Defendant, ordering him to stop offering or selling the investment opportunity in Pennsylvania. (*Id.* at ¶ 12.) In December 2009, the Financial Investment Regulatory Authority barred Defendant's association with any of their members. (*Id.*)

Nevertheless, between November 2009 and July 2012, Defendant continued to solicit and receive investment funds from clients under the guise of Income Property Group, LLC. (*Id.* at ¶ 13.) Defendant also encouraged at least two clients to mortgage their personally-owned homes to acquire additional funds to invest with him. Defendant submitted the mortgage applications on their behalf, which he supplemented with false tax returns and asset verifications in the applicants' names. (*Id.* at ¶ 14.)

A one-count Information was filed against Defendant on September 2, 2014, charging him with mail fraud from June 2006 through September 2013, in violation of 18 U.S.C. § 1341. (Doc. 1.) Defendant pleaded guilty to the Information on September 23, 2014. (*See* Docs. 9 & 10.)

On February 10, 2015, the probation officer assigned to this case filed a Pre-Sentence Report, wherein she assigned Defendant a base offense level of 7 pursuant to Section 2B1.1(a)(1) of the United States Sentencing Guidelines ("U.S.S.G."). Based upon the Government's representation that Defendant received investment funds totaling $2,328,829.69 from eleven investors, and that ten of those investors suffered individual losses of $10,000 to $926,500, for a total loss of $1,802,170.22 (*id.* at ¶ 8), the probation officer added sixteen levels under U.S.S.G. § 2B1.1(b)(1)(I) because the amount of the loss was more than $1 million and less than $2.5 million. Because the offense involved ten or more victims, she

assigned two levels under U.S.S.G. § 1.1(b)(2)(A). Pursuant to U.S.S.G. § 2B1.1(b)(9)(C), she assigned two levels because Defendant continued to defraud investors after the Pennsylvania Securities Commission issued a cease and desist order. She added an additional two levels under U.S.S.G. § 2B1.1(b)(10)(C) for the use of sophisticated means. Because the offense involved a violation of securities law and Defendant was an investment advisor representative, she applied an additional four-level increase under U.S.S.G. § 2B1.1(b)(19)(A). The probation officer calculated the resulting offense level as 33. Following a three-level reduction for acceptance of responsibility, Defendant's total offense level is 30. With a criminal history category of I, his guidelines imprisonment range is 97 to 121 months.

Defendant filed objections to the Pre-Sentence Report on January 12, 2015, in which he objected to (1) the amount of the loss; (2) the enhancements for ten or more victims; (3) the sophisticated means enhancement; and (4) the securities law/investment advisor enhancement.[1] (Doc. 18, pp. 4-9 of 9.) On June 8, 2015, the Government timely filed a brief opposing the objections. (Doc. 26.) Following evidentiary hearings held on June 15, 2015 and July 28, 2015, the Government filed a supplemental brief on September 28, 2015 (Doc. 49), and

---

[1] Following a conference with the attorneys in this matter, the court scheduled an evidentiary hearing for June 15, 2015, in order to provide Defendant with sufficient time to gather factual data on the amount of the loss. (*See* Doc. 22.)

Defendant responded on November 1, 2015 (Doc. 53). On December 1, 2015, the Government filed a reply to the objections. (Doc. 56.)

**II.     Discussion**

In his brief supporting his objections to the Pre-Sentence Report, Defendant argues that (1) the court should grant a downward variance because his fraudulent conduct was "significantly different and far less insidious" than other fraud cases prosecuted in this circuit (Doc. 53, pp. 4-15); (2) his loss level should be reduced from 16 to 14 because the investment in Lukoil did not involve fraud (*id.* at p. 16); (3) the two-level enhancement for use of sophisticated means is not warranted (*id.* at pp. 16-20); (4) the enhancement for a violation of a court order is improper (*id.* at pp. 21-23); (5) he was not an investment advisor and therefore his offense level should not be increased by 4 (*id.* at pp. 23-26); and (6) the enhancement for 10 or more victims is improper (*id.* at pp. 27-31). As such, Defendant argues that his total offense level should be 18 and his corresponding sentencing guideline range should be 27 to 33 months. (*Id.* at p. 32.) After careful consideration of Defendant's objections and his supporting arguments, the court will deny Defendant's objections in their entirety for the following reasons.

**A.     Downward Variance**

Defendant previously argued that the loss calculation of $1.8 million should be reduced to less than $750,000. During the hearings, however, Defendant

withdrew his objection to the loss (N.T. 204), and now argues, instead, that the court should grant a downward variance (Doc. 53, pp. 4-15).

Defendant argues that he made a good faith effort to create real, profitable business ventures for his investors. Specifically, he contends that he used his own money to rehabilitate vacant and rundown properties, secure permits, and pay real estate taxes and other costs associated with the rehabilitation of the properties. Yet he acknowledges that he falsely represented the investment opportunities to his investors and caused them serious harm. (*Id.* at p. 6.)

At the evidentiary hearings, Defendant produced documents he claims reflect the costs associated with maintaining and rehabbing the properties. While these documents were prepared by Defendant, they were not prepared by an independent accountant. Defendant has a credibility issue. Indeed, at the hearing, he admitted to lying and making false representations to the victims. (N.T. 334-36.)

Furthermore, as the Government points out, in *United States v. Evans*, 744 F.3d 1192 (10th Cir. 2014), the Tenth Circuit held that a defendant in a real estate investment fraud was not entitled to credit against loss because monies used to cover business losses "provided no ultimate benefit to investors and prolonged the fraud." *Id.* at 1198.

Defendant also claims that another consideration for a variance is that some of the victims received cash returns on their investments. However, these returns were paid from investment funds provided by other investors. The United States Sentencing Guidelines preclude this kind of offset. U.S.S.G. § 2B1.1 cmt. N. 3(F)(iv).

Further weighing against a variance is that Defendant's investors consisted primarily of clients he had when he was a financial advisor employed at Investors Capital Corporation and brokersXpress. (N.T. 18.) Most of these clients were elderly.

In addition, Defendant's investment opportunities were permeated by fraud and misrepresentations as follows:

1) Investors' names were not placed on the deeds of the properties investment funds were placed; rather, the properties were placed in the name of Elizabeth Gallardo (N.T. 18);

2) Blue Meadow Group LLC did not qualify as a Real Estate Investment Fund (N.T. 23);

3) Investors' monies were deposited into accounts held by straw parties, not in the name of Defendant or Blue Meadow Group (N.T. 34-35);

4) Some of the investors' monies were transferred to an online day trading account in Elizabeth Gallardo's name and then used by Defendant to fund risky day trading (N.T. 57);

5) When investigated by the Pennsylvania Securities Commission, Defendant falsely claimed that he had no interest in Blue Meadow Group, LLC and that he did not recommend investments in that entity to his clients (N.T. 35);

6) Defendant persuaded some investors to confirm the aforesaid information by signing letters he prepared (N.T. 4, 36).

### B.     Investment in Lukoil

Defendant further claims that the amount of the loss sustained in the investment in the Lukoil franchise, *i.e.* $651,000, should be deducted from the total loss calculation. (Doc. 53, pp. 16-17.) He claims that this investment was legitimate and that there was an absence of any fraudulent inducement. (*Id.*) He further argues that the Lukoil franchise only failed because of the unwillingness of the investors to assist in the operation of the station and because he incurred Lyme's disease that prevented him from operating the station.

Regardless of the facts surrounding the failure of the Lukoil franchise, what is relevant is that this venture opportunity was offered to four investors, Tom and Lucy McConnell, Lily Fields, and Robert Gissubel as a real estate investment. (Gov. Ex. 17.) Defendant represented to them that the investment would qualify as

an IRA rollover and that the money would be invested in real estate. (N.T. 82-83; Gov. Ex. 17.) Furthermore, to initially obtain the franchise, Defendant lied on his application about his income, the source of his income, the true owners of the bank accounts in which funds would be deposited as well as the training and ability of the person who would be running the franchise. (N.T. 334-36.) Had Defendant been truthful in his application, it is unlikely that he would have been awarded the franchise.

Accordingly, the Lukoil investment was not a legitimate investment, and the loss calculation will not be reduced by $651,000.

### C. Sophisticated means

"While the Application Notes to [U.S.S.G.] § 2B1.1 suggest that the use of 'fictitious entities, corporate shells, or offshore financial accounts' would constitute sophisticated means, an offense can easily warrant the sophisticated means enhancement absent the use of those tactics." *U.S. v. Fountain*, 792 F.3d 310, 319 (3d Cir. 2015) (citing *U.S. v. Jennings*, 711 F.3d 1144, 1147 (9th Cir. 2013)). "Determining whether a defendant employed sophisticated means can involve considering factors like the duration of a scheme, the number of participants, the use of multiple accounts, and efforts to avoid detection." *Id.* (citing U.S. v. Fish, 731 F.3d 277, 280 (3d Cir. 2013)).

Defendant's actions meet all of the above factors. The enhancement will be applied.

### D.     Violation of a court order

Defendant claims that there was no violation of the Pennsylvania Security Commission's cease and desist order which issued on July 14, 2009. He claims that many of his victims invested with him prior to that date. However, at the sentencing hearing on July 28, 2015, Defendant admitted that, after the cease and desist order was issued, he conducted business on behalf of clients from his office in Pennsylvania, sent faxes about his clients' investments from that office, and deposited money into bank accounts in Pennsylvania. (N.T. 367-68, 372.)

Defendant further argues that none of the investors were Pennsylvania residents and therefore the cease and desist order was not violated. However, the order reads as follows:

> IT IS ORDERED that the Respondents Blue Meadow Group, LLC, Joseph Gallardo and Elizabeth Gallardo, and every successor, affiliate, control person, agent, servant, and employee of each of them, and every entity owned, operated, or indirectly or directly controlled or hereinafter organized by or on behalf of them, shall immediately CEASE AND DESIST from offering and selling the Opportunity in the Commonwealth of Pennsylvania, in violation of the 1972 Act, and in particular Section 201 thereof.

(Gov. Ex. 10, p. 3.) The order clearly states that Defendant and his organization were prohibited from selling or offering to sell investments within the

Commonwealth of Pennsylvania to *anyone*. The fact that his investors were residents of New Jersey is immaterial. In addition, Defendant admitted that the fraudulently represented properties were all in Pennsylvania.

For the above reasons, this enhancement will be applied.

### E. Investment advisor enhancement

Defendant argues that he was neither an investment advisor nor did his offense involve a violation of securities law.

The court adopts the Government's argument that Defendant meets the definition of a security advisor as set forth in its reply brief, Doc. 56, pp. 7-8.

This enhancement will be applied.

### F. Victimization of 10 or more individuals

Finally, Defendant argues that the guidelines enhancement for 10 or more victims should not be attributed to him. He argues that five of the victims included in the Pre-Sentence report do not qualify as victims.

Under U.S.S.G. § 2B1.1, a victim is a "person who sustained any part of the actual loss . . ." U.S.S.G. § 2B.1.1. comment n.1. "Actual Loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* at comment n.3(A)(i). "Pecuniary harm" is "harm that is monetary or that is otherwise readily measurable in money." *Id.* at comment n.3(A)(iii).

Inspector Hartman testified that LM reported that AMS is her aunt and is currently in hospice. (N.T. 76.) AMS was Defendant's client at Investors Capital Corp and brokersXpress. (*Id.*) According to LM, in 2007 and at the Defendant's direction, AMS withdrew $65,838.98 from her ICC and brokersXpress accounts to be invested in Blue Meadow Group. (Doc. 48.) AMS then issued a check for $65,838.98 payable to LM, who then deposited it and wrote a $50,000 check from those funds payable to Elizabeth Gallardo, again at Defendant's direction. (*Id.*) Defendant advised that the remaining $15,000 would be transferred from LM's real estate investment with Defendant for credit to AMS's real estate investment. (*Id.*) These transactions are corroborated by the Government's exhibits, including cancelled checks and Defendant's handwritten notes. (*See* Gov. Ex. 101.) A similar series of transactions occurred in 2009. (*Id.*) While Defendant argues that AMS is not a victim because he did not personally discuss real estate investments with her, LM had power of attorney for AMS and therefore it is not surprising that he may not have dealt directly with her. AMS qualifies as a victim.

MA is Elizabeth Gallardo's aunt. She reported to Inspector Hartman that she invested $100,000 with him in July 2010, and that, at the time, she was unaware that Defendant was no longer a financial adviser. (N.T. 65.) She issued a check in that amount payable to Elizabeth Gallardo. Both she and Elizabeth Gallardo denied that the money was a loan or a gift. (N.T. 69.) Inspector Hartman

testified that, rather than being invested, the money was used to pay Defendant's personal credit cards, mortgage payments, car payments, and utility payments. (N.T. 66-67.)  In addition, Defendant used MA's name and financial information to apply for a mortgage without her knowledge, and also opened a day trading account in her name, made unprofitable day trades, and transferred the remaining balance to his personal bank account.  (N.T. at 67-68.) MA also qualifies as a victim.

There are two individuals with the initials "TM."  Although the first TM, who is described in Paragraph 18 of the Pre-Sentence Report, is not entitled to restitution, he also qualifies as a victim.  Defendant told TM that he was taking $50,585.13 from TM's IRA account to rollover into another IRA qualified account. (N.T. 349.)  During the hearing, Defendant acknowledged that this was a lie. (N.T. 349.)  As a result, the Internal Revenue Service assessed TM a penalty and interest in the amount of $21,130.  (N.T. 76.)   As such, TM suffered actual economic harm by being assessed a penalty that he otherwise would not have incurred and is therefore a victim.  *See United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009) (defining a "victim" under the Sentencing Guidelines to include an individual "who suffered an adverse effect as a practical matter from the defendant's conduct").

The second TM, who is referenced in Paragraph 70 of the Pre-Sentence Report, invested $150,000 individually with Defendant, making the total investment between him and his wife $265,000. (N.T. 75-76.) Defendant contends that TM is not a victim because they had a partnership to buy Lukoil. (N.T. 349.) Defendant admitted, however, that TM invested the money based on Defendant's misrepresentations. Defendant did not tell TM that he lied on the application for the Lukoil franchise by falsifying income and the source of that income as well as the background and qualifications of the people who would allegedly operate the franchise. (N.T. 350-51.) TM also qualifies as a victim.

However, there is insufficient evidence to establish that Elizabeth Gallardo's mother, SR, is a victim. (N.T. 71.) SR gave a check to Defendant made payable to Income Property Group and noted on the check that it was an "investment." (N.T. 71-72; Gov. Ex. 41.) Although SR reported to Inspector Hartman that, at the time she wrote the check, she believed Defendant was a financial advisor for brokersXpress (N.T. 73), she later told the authorities that, after giving the check to Defendant, she told him, "if you need the money, keep it." (Gov. Ex. 43; N.T. 237.)

Even without the inclusion of SR, however, the Government has identified ten victims and, therefore, the enhancement for ten or more victims will be applied.

## III. <u>Conclusion</u>

For the reasons stated above, Defendant's objections to the Pre-Sentence Report will be denied and no variance will be granted.

                                                   s/Sylvia H. Rambo
                                                   SYLVIA H. RAMBO
                                                   United States District Judge

Dated: January 12, 2016