IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | Crim. No. 1:14-cr-221 |
|---|---|---|
| v. | : | |
| JOSEPH GALLARDO | : | Judge Sylvia H. Rambo |

# **M E M O R A N D U M**

Presently before the court is Joseph Gallardo's ("Gallardo") petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. After extensive consideration, and for the reasons that follow, the court is constrained to find that Gallardo received constitutionally ineffective assistance of counsel, in the absence of which there is a reasonable probability that he would not have pleaded guilty. Accordingly, the petition will be granted and Gallardo's conviction and sentence will be vacated.

## I.   **Background**

Gallardo, who is presently 51 years old, immigrated to the United States from Cuba with his family on July 14, 1973, at age 10, and became a legal permanent resident in 1977. While he never applied for citizenship, he married an American citizen in 2005, and resided with his daughter and step-daughter in Pennsylvania up until the time that he was incarcerated for the instant offense.

From 2006 to 2009, while acting as the chief executive officer of a real estate venture called Blue Meadow Group, LLC, Gallardo perpetuated a fraudulent scheme in which he induced his clients to invest in a so-called Real Estate Investment Trust by promising that their money would be invested in and protected by real estate and that they would receive guaranteed rates of return. In reality, he used the funds to "invest" in dilapidated homes and a gas station, pay personal living expenses, purchase thousands of dollars of gasoline and fast food, finance his own risky and unprofitable day trading activity, and make purported interest payments to his investors that he characterized as returns on profitable real estate investments. After the Pennsylvania Securities Commission began investigating his fraudulent activities, Gallardo falsely advised that he never encouraged his clients to invest in Blue Meadow Group, and then induced one of his clients to corroborate his false statements in a letter sent to the Pennsylvania Securities Commission on May 6, 2009. Records obtained by investigators revealed that twenty-eight checks totaling $1,842,901.00 were drawn on the bank accounts of nine clients, or from accounts on their behalf, and deposited into six accounts in the name of Gallardo's wife, Elizabeth Gallardo ("Elizabeth"), or Blue Meadow Group.

On September 30, 2013, the Government filed a criminal complaint against Gallardo,[1] and in March 2014, Gallardo retained Joshua Lock, Esquire ("Mr. Lock" or "Counsel"), who represented Gallardo through his sentencing. For months, Mr. Lock and the government worked tirelessly to secure a plea deal wherein Gallardo's wife, who was implicated in the scheme but played a much smaller role in the offense conduct and largely at the behest of her husband, would pay a substantial sum of restitution while Gallardo would plead guilty to a criminal offense. In an effort to resolve the case with Gallardo, the government identified the May 6, 2009 mailing and proposed an information and plea agreement to one count of mail fraud, in violation of 18 U.S.C. § 1341.

In considering the government's offer, Mr. Lock and Gallardo discussed "the likely outcome of a trial, the ability to raise the mitigation in the context of the loss hearing and at sentencing in support of [a] request for a variance, and . . . the superordinate concern about the welfare of [Gallardo's] family." (§ 2255 Hr'g Tr. at 10, Nov. 15, 2017.) Although Gallardo frequently expressed apprehension about pleading guilty (*id.* at 12, 37-38), he ultimately made the decision to accept the government's proposal in order to absolve his wife of criminal liability. To that end, Gallardo signed a document entitled, "Waiver Agreement," dated April 5, 2014 (Doc. 141-1, pp. 4-6 of 12), to extend that statute of limitations regarding the

---

[1] On October 2, 2013, Magistrate Judge Susan Schwab ordered Gallardo detained pending trial. (Doc. 14, 1:13-MJ-093.)

May 6, 2009 mailing in an effort to give the government additional time to resolve the case against his wife without criminal charges being brought against her. At some point during the summer of 2014, his wife paid the government approximately $851,000.00 in restitution. (§ 2255 Hr'g Tr. at 85.)

Thereafter, on September 2, 2014, the government filed a one-count Criminal Information charging Gallardo with mail fraud, in violation of 18 U.S.C. § 1341. (Doc. 1.) On September 23, 2014, Gallardo waived his right to a grand jury indictment and pleaded guilty to the Criminal Information. On February 9, 2016, Gallardo was sentenced to ninety-seven months imprisonment, followed by three years supervised release, restitution in the amount of $1,792,170.22, and a special assessment in the amount of $100. (Doc. 60.)

On November 4, 2016, Gallardo filed a *pro se* motion to vacate pursuant to 28 U.S.C. § 2255 asserting twenty-nine different grounds covering a broad range of alleged ineffective assistance claims from plea negotiations through sentencing. (Doc. 132.) On August 16, 2017, the court appointed Edward Rymsza, Esquire ("Mr. Rymsza"), to represent Gallardo in all post-conviction proceedings, and on August 18, 2017, Mr. Rymsza filed an unopposed motion to amend/supplement the *pro se* § 2255 motion.

On October 6, 2017, an amended § 2255 motion was filed. In that motion, Gallardo, through Mr. Rymsza, asserted, for the first time, that he was denied

4

effective assistance of counsel because Mr. Lock had failed to warn him that if he were convicted of mail fraud he would likely be deported, and that he was in no other way informed of the possibility of facing deportation upon accepting such a plea.

At an evidentiary hearing on Gallardo's motion, Mr. Lock acknowledged that, although he was aware of Gallardo's immigration status both prior to and after the entry of the guilty plea, he never advised Gallardo that his plea carried a risk of deportation. (§ 2255 Hr'g Tr. at 13-17, 30-33.) He further testified that he does not recall having any discussions regarding potential immigration consequences with the government during plea negotiations. (*Id.* at 34.) Indeed, the twenty-six page plea agreement is silent as to any such matter. (*See* Doc. 3.) At the change of plea hearing, the court did not advise Gallardo that he may be subject to removal, *see* Fed. R. Crim. P. 11(b)(1)(O), and neither Mr. Lock nor the government requested an inquiry on the matter. Instead, it appears that Gallardo was first advised that he may be deported in the pre-sentence report, which was filed on February 10, 2015. (PSR ¶ 42.)

## II. <u>Legal Standard</u>

The Sixth Amendment guarantees a defendant effective assistance of counsel at "critical stages of a criminal proceeding, including when he enters a guilty plea." *Lafler v. Cooper*, 566 U.S. 156, 165 (2012). To demonstrate that

5

counsel was constitutionally ineffective, a defendant must show that counsel's representation fell below an objective standard of reasonableness, and that he was prejudiced as a result of counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). In the context of a guilty plea, a defendant is required to show that but for counsel's errors, he would not have pleaded guilty and would have instead insisted on proceeding to trial. *Lafler*, 566 U.S. at 163 (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

### III. Discussion

Gallardo contends that his counsel was constitutionally deficient for failing to advise him that his guilty plea carried a risk of deportation. He further states that, had he been properly advised, he would not have pleaded guilty.

In *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that counsel has a "quintessential" Sixth Amendment duty to provide a noncitizen "client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.'" *Id.* at 371 (quoting *Hill*, 474 U.S. at 62). The Court explained that in cases where the deportation consequences of a plea are "unclear or uncertain," counsel must simply advise the "client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* at 369. But when the statutory language makes the deportation

consequences of a plea "truly clear, . . . the duty to give correct advice is equally clear." *Id.*

Here, as in *Padilla*,[2] the terms of the relevant immigration statute are "succinct, clear, and explicit" in defining the removal consequences of Gallardo's conviction for mail fraud. *See* 8 U.S.C. § 1227(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable"). Counsel could easily have determined from reading the text of the statute that Gallardo's plea would make him eligible for deportation, as the statute specifically directs removal for aggravated felony convictions. Instead, he offered no advice at all, which is "fundamentally at odds with the critical obligation of counsel to advise the client of 'the advantages and disadvantages of a plea agreement,'" especially in the context of deportation. *Padilla*, 559 U.S. at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50-51 (1995)). Thus, counsel's failure to provide Gallardo with available advice about deportation clearly satisfies the first prong of the *Strickland* analysis.

---

[2] For reference, the relevant statutory language in *Padilla* provides that:

> Any alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign county relating to a controlled substance (as defined in section 802 of Title 21), other than a single offense involving possession for one's own use of 30 grams or less of marijuana, is deportable.

8 U.S.C. § 1227(a)(2)(B)(i).

7

The question thus becomes whether Gallardo can show that he was prejudiced by his counsel's deficient performance. The Supreme Court's recent decision in *Lee v. United States*, --- U.S. ---, 137 S. Ct. 1958 (2017) is instructive in this regard.

Lee came to the United States from South Korea with his parents when he was a child and remained as a lawful permanent resident for thirty-five years, without becoming a United Sates citizen or returning to South Korea. *Id.* at 1962-63. After his indictment on a drug offense, the government offered him a plea deal with a lower sentence than he faced at trial, and his attorney advised him to take the deal in light of the considerable evidence against him. *Id.* at 1963. Lee told his attorney about his non-citizen status and repeatedly asked whether he would face deportation as a result of the conviction. *Id.* Based on his attorney's assurance that he would not be deported, Lee pleaded guilty and was sentenced to one year and one day in prison. *Id.* at 1968. Lee pursued § 2255 relief when he learned that his drug conviction subjected him to mandatory deportation. *Id.*

The Supreme Court held that counsel's deficient performance led not to a "judicial proceeding of disputed reliability," but rather to the forfeiture of an entire proceeding to which Lee had a right. *Id.* at 1965 (citations omitted). While Lee's prospects of acquittal were grim, the Court nonetheless found credible Lee's

position that, had he known he would be deported upon conviction, he would have rejected the plea in favor of trial. *Id.* at 1968. The court explained:

> But for his attorney's incompetence, Lee would have known that accepting the plea agreement would certainly lead to deportation. Going to trial? Almost certainly. If deportation were the "determinative issue" for an individual in plea discussions, as it was for Lee; if that individual had strong connections to this country and no other, as did Lee; and if the consequences of taking a chance at trial were not markedly harsher than pleading, as in this case, that "almost" could make all the difference.

*Id.* at 1968-69. The Court framed the dispositive question as not how a hypothetical trial would have played out, but rather whether absent the error and with proper advice there was a reasonable probability that the defendant would have rejected the plea deal. *Id.*

*Lee* is both analogous to and distinguishable from the instant case. The record in *Lee* unequivocally supported a finding that Lee would not have pleaded guilty had he known that his conviction would result in his deportation. Unlike Lee, Gallardo's immigration status was not a determinative issue for him during plea negotiations. However, his attorney failed to advise him that a guilty plea could subject him to deportation and the topic never came up during discussions with the government. He was likewise not informed of the potential immigration consequences by the plea agreement or by the court during the plea colloquy. Arguably, Gallardo had no need to articulate the importance of his legal permanent resident status if he believed losing it was not an issue.

9

Like Lee, Gallardo came to this country as a boy. At the time of his guilty plea, he had maintained lawful permanent resident status in the United States for nearly four decades, had two minor children and a wife who are United States citizens, and had no ties to Cuba. The welfare of his family was his "superordinate concern" during plea negotiations, and ensuring that his wife avoided criminal charges was his primary impetus in reaching a deal. Although the evidence against Gallardo was overwhelming, had he known that his guilty plea would result in deportation, he rationally might have thought the chance of remaining with his family in the United States worth the risk of a longer jail sentence and his wife facing criminal penalties. Tellingly, even without the risk of deportation on the table, Gallardo often wavered on his decision to plead guilty.[3]

Also determinative is the fact that neither Gallardo's counsel nor the government brought Gallardo's immigration status into the plea-bargaining process despite the fact that his right to remain in the United States may have been more significant to him than any potential jail sentence. *See United States v. Orocio*, 645 F.3d 630, 645 (3rd Cir. 2011). The extent of Gallardo's criminal conduct provided

---

[3] Since the time of his sentencing, Gallardo has devoted his time in prison to zealously pursuing relief from his conviction, with his filings frequently accusing the "corrupt adversary system" and particularly the Assistant United States Attorney of coercing him into signing a guilty plea in violation of his constitutional right to a jury trial. (*See, e.g.*, Docs. 70-71, 75-76, 79, 82-83, 94-97, 99, 109, 115-16, 121, 124, 131, and 140.) Gallardo's insistence that he had "no choice" but to sign the guilty plea (*see, e.g.*, Doc. 83, p. 1 of 38) suggests that the outcome of the proceedings would not have been different even if he had known that deportation was a consequence of his plea. Fortunately for Gallardo, the court gives no weight to any of his testimony or accusations. (*See* Doc. 181, pp. 13-15.)

the basis for multiple charges, and both sides had strong incentive to reach a deal—the government to obtain restitution for the victims and Gallardo to reduce his sentence and protect his wife. Had the parties considered the deportation consequences of a particular offense, they may have been able to creatively craft a deal that reduced the likelihood of deportation. *See Padilla*, 559 U.S. at 376. Instead, they reached a deal on an offense that automatically triggers the removal consequence without alerting Gallardo to its implications, and failed to include a deportation clause in the plea agreement.

Finally, the government contends that any prejudice to Gallardo was mitigated by the pre-sentence report, which noted that "[t]he defendant faces possible deportation as a result of his conviction." (Doc. 17, ¶ 41.) With that notice, the government argues, Gallardo could have raised concerns prior to his sentencing. "The question under *Strickland* and *Hill*, however, is not whether [Gallardo] had later access to remedies, but whether he would have pled guilty at all." *Orocio*, 645 F.3d at 646. Furthermore, even after the release of the pre-sentence report, Counsel did not discuss the deportation advisement with Gallardo or the possibility of any remedial measures, such as moving to withdraw his plea. As such, a single reference to deportation in the pre-sentence report was too generalized and far too late in the process to effectively alert Gallardo to the removal consequences of his guilty plea.

11

## IV. **Conclusion**

A general regard for Cuba as a recalcitrant country undoubtedly led to the across-the-board failure in this case to consider the immigration consequences of Gallardo's guilty plea, yet today Gallardo sits in Moshannan Valley Correctional Center facing deportation. (*See* Doc. 177, pp. 10-11.) Gallardo was not only denied the effective assistance of counsel during a critical phase of litigation, but he was also unadvised by both the plea agreement and this court of the implications of his plea. Had he known that he faced deportation, he rationally could have been more concerned about banishment from the United States than the possibility of additional jail time or his wife facing criminal penalties. Under these circumstances and considering the severity of deportation, the § 2225 petition must be granted and the conviction and sentence vacated.

An appropriate order will issue.

                                                s/Sylvia H. Rambo
                                                SYLVIA H. RAMBO
                                                United States District Judge

Dated: April 19, 2018